FILED

2018 Jul-06  PM 02:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JEREMY CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:18-cv-350-JEO |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| COMPANION LIFE INSURANCE | ) | |
| COMPANY, HEALTH INSURANCE | ) | |
| INNOVATIONS, INC., | ) | |
| ALLIED NATIONAL, INC., and | ) | |
| MED-SENSE GUARANTEED | ) | |
| ASSOCIATION, | ) | |
| Defendant No. 1, being that entity which | ) | |
| owned and/or operated the named | ) | |
| Defendant entities; | ) | |
| Defendants No. 2, & 3 being those persons | ) | |
| or entities which caused or contributed to | ) | |
| cause the actions and in the complaint that | ) | |
| resulted in the injury of Carter; | ) | |
| Fictitious Party 4 was the principal of | ) | |
| another defendant and is therefore liable for | ) | |
| the negligent and/or wanton acts of its | ) | |
| agents; Fictitious Party 5 was the | ) | |
| predecessor in interest of another defendant | ) | |
| and therefore is responsible by contract or | ) | |
| operation of law for that defendant's | ) | |
| negligent and/or wanton acts.  Fictitious | ) | |
| Party 6 was the successor in interest of | ) | |
| another defendant and by contract or | ) | |
| operation of law assumed the liabilities of | ) | |
| another defendant; all of whose true and | ) | |
| correct names are otherwise unknown to | ) | |
| Carter at this time but will be added by | ) | |
| Amendment when properly ascertained, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

1.     Plaintiff Jeremy Carter, by and through his attorney, hereby files the following Amended Complaint against Defendants Companion Life Insurance Company; Health Insurance Innovations, Inc.; Allied National, Inc.; Med-Sense Guaranteed Association, and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

2.     Plaintiff Jeremy Carter ("Carter") is an adult citizen of Alabama and, at all times relevant hereto, was insured under an individual health insurance policy underwritten by Companion Life Insurance Company.

3.     Defendant Companion Life Insurance Company ("Companion Life") is a foreign corporation with its principal place of business in South Carolina transacting business in this state and jurisdiction. Companion Life is an insurance company licensed to sell certain insurance products in Alabama but, upon information and belief, it is not licensed to sell health insurance.

4.     Defendant Allied National, Inc. ("Allied") is a foreign corporation with its principal place of business in Kansas transacting business in this state and jurisdiction.  Allied acted as a third-party administrator handling claims submitted under the insurance underwritten by Companion Life.  That is, pursuant to a third-

party administrator agreement, Allied acted on behalf of Companion Life with respect to the handling of claims made under the short-term medical insurance policy at issue in this matter.

5.      Defendant Health Insurance Innovations, Inc. ("HII") is a foreign corporation with its principal place of business in Florida transacting business in this state and jurisdiction. Upon information and belief, HII entered into an Agency Agreement with Companion Life whereby HII served as the agency for the marketing, production, underwriting, servicing, and administration of the short term medical insurance policy at issue in this matter.

6.      Defendant Med-Sense Guaranteed Association ("Med-Sense") is, upon information and belief, a not-for-profit business incorporated in Illinois and transacting business in this state and jurisdiction.  Upon information and belief, under an agreement among and between Companion Life, Med-Sense and HII, HII markets and administers Med-Sense association memberships and collects fees and dues on behalf of Med-Sense from HII's offices in Tampa, Florida.

7.      Additionally, and in the alternative, at all relevant times herein, Defendant Med-Sense was operating, or was purporting to operate as a "private insurer," as defined in Alabama Code § 27-14-11.1, et seq.

8.     Upon information and belief, at all relevant times, each and every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants. Carter is informed and believes that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

9.     Carter pleads causes of action arising under the statutory and common law of the State of Alabama.  Further, the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and is between citizens of different States.  Jurisdiction is proper in this Court under 28 U.S.C. §1332.

10.     All actions, conduct and omissions occurred in Shelby County in the State of Alabama.  Venue of this action is proper in this Court.

## FACTUAL BACKGROUND

11.     Defendant Med-Sense was formed for the improper purpose of selling health insurance nationally to the insurance buying public.  The health insurance sold by Med-Sense and its agents is purposefully bundled with other purported "benefits," such as travel discounts or pre-paid legal services, to obfuscate the Med-Sense's *actual* purpose of selling health insurance under the auspices of a "group

association" or "group benefit," thus fostering a belief in consumers that the Med-Sense coverage is "group" coverage with benefits and protections similar to job-based group insurance.  These types of associations must be organized for a specific purpose *other* than to sell health insurance in order to qualify as bona fide group insurance.   When coverage is sold through national associations, almost no consumer protections apply.

12.     The named and fictitious party Defendants operate by issuing, causing to issue, maintaining and/or facilitating purported "Group Policies" in the name of Med-Sense Guaranteed Association that supposedly allow affordable, quality health insurance. This/these "Group" policies were created for the purpose of selling medical insurance policies which are not subject to regulation.

13.     In other words, implicit in the formation and operation of Med-Sense is its purpose of being the legal entity which facilitates the issuance of a "Group" policy of health insurance.

14.     Thereafter, Med-Sense, by and through the other Defendants, sells memberships so that it can sell to an unknowing and unwitting public sham health insurance in the guise of "major medical" coverage, all the while disguising, among other things: (a) the full and true nature of the relationship between the Defendants; (b) that Med-Sense is not an association formed in good faith for purposes other than

procuring insurance, (c) that Med-Sense is acting in the interests of itself and its Co-Defendants rather than its "members"; (d) to charge undisclosed premiums, association fees, membership dues, administrative and processing fees, and provide kickbacks among each other, as laid out in Paragraph 61.

15.    Med-Sense's membership consists of insurance consumers who are seeking, and who believe they are buying, real, beneficial, individual health insurance.  Defendants' targeted consumers were not previous members of the Med-Sense, but instead automatically became members of Med-Sense when they purchased the health insurance at issue herein.

16.    Defendants, in conspiracy and conjunction with each other, intentionally played upon the vulnerabilities of people who either could not qualify for or could not afford traditional health insurance coverage by falsely representing the Med-Sense/Companion Life policies as a low-cost way to obtain such coverage.  The deception arises from Med-Sense's affiliation with the product.  Health insurance policies offered by associations are perceived by the public to be bona fide health insurance, much like the kind of real health insurance offered by employers.  Defendants intended to create a false impression of the Companion Life/Med-Sense/HII plan by calling it "group" insurance.

17.   Defendants advertise on the internet at www.hiiquote.com. Upon information and belief, a substantial majority of HII's targeted consumers are obtained through internet marketing, specifically targeting those consumers searching for terms such as "Blue Cross Blue Shield," a true major medical insurance plan, and using agents to market and sell their products.

18.   Defendants entered into an agreement and arrangement among and between one another, wherein Defendants would market the Med-Sense/HII/Companion "group" medical insurance policies to the buying public.

19.   Defendants regularly communicated with one another regarding performance and marketing strategies;

   a.   Coordinating and sharing marketing scripts, plans, techniques, and designs; and

   b.   Actively including each other's products to potential customers.

20.   Defendants maintain the right to control the content of their agents' advertising.

21.   Defendants exercised these rights during the course of their relationship with each and every Co-defendant.

22.     Defendants market the products and services of each and every other Defendant.

23.     As agents of one another, each and every defendant is directly responsible for the actions of every other Defendant.

24.     Each and every Defendant also ratified the actions of every other defendant by knowingly accepting the benefits of each Defendant's activities by accepting applications and customers from each other, specifically as to the application and subsequent ensnaring of Carter as a new customer.

25.     Through this ratification, each and every Defendant is vicariously liable for the actions of each and every Co-defendant.

26.     The policies marketed and sold by Defendants contain a host of exceptions to coverage that are not articulated to consumers prior to or during the application process.   Indeed, their promotional materials and agents made representations to applicants, including Carter specifically, that coverage is much more expansive than it really is.

27.     On March 4, 2016, Carter performed a Google search of "Blue Cross Blue Shield," and one of the results directed Carter to HII/Defendants' website/telephone number.

28.    Carter thereafter called HII/Defendants to inquire about purchasing an individual health insurance policy.

29.    In the course of Carter's discussion with the HII/Defendants' agent, Carter stated that he was seeking to obtain an individual health policy to cover his medical needs and told the agent that he had searched "Blue Cross Blue Shield Alabama" on Google and found the information which led him to call HII Defendants (or an HII agent and/or an agent of another named or fictitious party defendant).

30.    During the telephone call on March 4, 2016, Defendants, by and through an HII agent and/or an agent of another named or fictitious party defendant, induced Carter to purchase the Med-Sense/Companion Life policy with misleading words and phrases, including the promise that the policy pays benefits like a "major medical insurance plan...."

31.    The HII/Defendants' agent informed Carter that HII could find a health insurance policy for Carter that would satisfy his medical needs. The agent ultimately indicated that a health insurance policy underwritten by Companion Life was available to satisfy Carter's medical insurance needs. The HII/Defendants' agent informed Carter that the Policy covered everything "except pregnancy and rehab."

32.    Carter was assured by the HII/Defendants' agent that he qualified for the Companion Life medical insurance policy, which included up to $1,000,000 in coverage with a $2,500 deductible.

33.    During this phone call, Carter was instructed to provide answers to a series of questions asked by the representative on the call.  Carter did not have any application or underwriting documents or screens available to him to read himself during this process.

34.    Carter answered all of the questions that he was asked by the HII/Defendants' agent honestly, completely, and to the best of his knowledge and ability.

35.    Carter was not provided with a physical or electronic version of an insurance application to review or sign.

36.    Carter was not provided with an application for Med-Sense to review or sign.

37.    HII/Defendants' agent assured Carter that he qualified for the Med-Sense/Companion Life medical insurance policy.  Thereafter, the HII/Defendants' agent completed and submitted an "application" for health insurance coverage for the Companion Life policy on behalf of Carter.

38.    HII/Defendants' agent stated to Carter that his Med-Sense Group insurance policy would include extra benefits, such as discounts on travel and health services.  Carter specifically stated that he was not interested in those services, only that he was calling for purposes of obtaining health insurance.

39.    HII/Defendants' agent then quoted Carter a monthly premium payment in the amount of $277.34.  HII/Defendants' agent did not tell Carter that only $102.34 went to the monthly health insurance premium, and that the majority of his payment ($175.00) went toward membership/service fees that Carter was not interested in, specifically stated that he was not interested in, and was not aware were packaged in the guise of a medical insurance policy.

40.    Thereafter, Carter became insured under a medical insurance policy issued by Companion Life to Med-Sense and administered by HII and/or Allied.

41.     Upon information and belief, HII received significant commissions, fees, and/or other compensation, both directly and indirectly, in connection with the enrollment of Carter in Med-Sense.

42.    Upon information and belief, HII received significant commissions, fees, and/or other compensation, both directly and indirectly, in connection with the placement of Carter with the HII/Companion Life short-term medical insurance policy associated with Med-Sense.

43.     Upon information and belief, Med-Sense received significant commissions, fees, and/or other compensation, both directly and indirectly, as a result of the sale of placement of Carter with the HII/Companion Life short-term medical insurance policy associated with Med-Sense.

44.     Upon information and belief, all Defendants received significant commissions, fees, and/or other compensation, and/or materially benefitted, both directly and indirectly, as a result of the sale of placement of Carter with the HII/Companion Life short-term medical insurance policy associated with Med-Sense.

45.     In the spring/summer of 2016, Carter spent time at Shelby Baptist Medical Center for health issues.  Carter underwent certain treatment and procedures as a result of these issues.

46.     Bills for the hospitalization, care, and treatment associated with Carter's medical issues/treatment in the spring/summer 2016 were submitted to Defendants for claim payment.

47.     During the year 2017, Carter was made aware that all charges submitted to Defendants by all providers had been denied, and that all medical bills incurred during the term of his policy had been sent to collections.

48.     Carter attempted numerous times to contact Defendants by calling telephone numbers listed on his insurance cards, to no avail.  Each time he would call, he was faced with long hold times, transfers, disconnections and other elusive behavior designed to frustrate customers and elude the Defendants' obligations.

49.     Defendants' actions in this regard are not random or isolated, but rather are a part of a pattern and practice by Defendants of communicating to potential and current policyholders that policies will meet their needs, then denying most, if not all, claims on the basis of pre-existing conditions or other grounds, and making any challenge of such denial untenable.

50.     Defendants agreed to, and participated in, a scheme, pattern, and practice to systematically deny and/or delay payment of claims made for benefits under Carter's policy and under the policies of others.

51.     The scheme, pattern, and practice to deny and delay claims, like Carter's claims, included, but was not limited to: (a) making it difficult for consumers to determine which entity or which person within which entity was responsible for responding to or answering questions about claims; (b) routinely denying claims by misapplication of the pre-existing condition limitation.  These practices were employed by Defendants with the intended purpose of denying claims and benefit payments.

52.     Defendants further engaged in a scheme, pattern, and practice to sell as many Companion Life/HII/Med-Sense policies as possible, and then improperly employ reverse underwriting tactics and sham investigations, both themselves, and by and through Allied, designed to deny most, if not all, claims on the basis of pre-existing conditions or other grounds.

53.     Defendants further engaged in a scheme, pattern, and practice to sell as many Companion Life/HII/Med-Sense policies as possible for the purpose of enriching themselves by wrapping membership fees, dues, and other hidden self-serving costs into the amount of the premiums both quoted to, and paid by, Plaintiff and others.

54.     Carter was a victim of these improper practices and has been damaged thereby.

55.     Defendants had no arguable or legitimate basis to deny Carter's claims. Defendants' denial of Carter's claim was made in violation of his insurance contract and in bad faith.

56.     Defendants knowingly defrauded Carter by selling him, and causing to be sold to him, a proverbial "bill of goods."

57.     Defendants preyed on Plaintiff and others seeking medical insurance, by and through the actions of each other Defendant and their agents.

58.     Defendants' conduct caused Carter to suffer mental anguish and emotional distress.

## COUNT I – CIVIL CONSPIRACY

59.     Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

60.     Med-Sense was formed in order to avoid insurance regulations under exceptions created for bona fide membership organizations formed for purposes other than providing insurance coverage.   However, Med-sense was formed for purposes of selling insurance.

61.     Defendants have engaged in an unlawful conspiracy to commit fraud and to misrepresent to and/or conceal from Carter, among other things: (a) the full and true nature of the relationship between the Defendants; (b) that Med-Sense is not an association formed in good faith for purposes other than procuring insurance, (c) that Med-Sense is acting in the interests of itself and its Co-Defendants rather than its "members"; (d) to charge undisclosed premiums, association fees, membership dues, administrative and processing fees, and provide kickbacks among each other.

62.     Defendants have engaged in an unlawful conspiracy to breach Med-Sense's fiduciary duties to Plaintiff.

63.     Defendants have engaged in an unlawful conspiracy to commit the other acts as enumerated in the Counts listed in this complaint, along with the facts and circumstanced delineated herein.

64.     Defendants combined and joined in a concerted effort to formulate a fraudulent and deceitful marketing scheme which prevented Carter and others from discovering the true relationship of Defendants and their plans to collect and share profits from improper fees and charges collected from Med-Sense members and HII/Companion Life's insureds.

65.     As set out herein, Defendants agreed and worked together to knowingly misrepresent information to and conceal material facts from Carter and others.  Acts of coconspirators are attributable to each other.   Defendants agreed and acted together to engage in unlawful conduct that injured Carter.

66.     At all times mentioned herein, Defendants intentionally, knowingly, and voluntarily participated in a common scheme ("common scheme") to market "group" medical policies / "major medical" policies, pursuant to an agreement whereby Defendants, acting in concert, furthered said agreement by Defendants' committing tortious acts, as set forth the Counts enumerated herein and incorporated by this reference. Defendants intentionally, knowingly, and voluntarily agreed to commit overt acts furtherance of the conspiracy.

67.    The "common scheme" in the paragraph above involves, among other things:

(1) Med-Sense not being formed in good faith for purposes other than procuring insurance;

(2) Med-Sense not complying with the requirements of its nonprofit existence;

(3) Defendants' not disclosing to Carter that association fees, membership fees and processing fees were, in fact, concealed premium;

(4) Defendants' evasion of regulation by using a putative nonprofit association, namely, Med-Sense, as a Group Policy holder, thereby enabling Defendants to avoid regulation/oversight, charge excessive rates and/or reap excessive compensation;

(5) Defendants' concealing from Carter the relationship among Defendants;

(6) Defendants' not providing Med-Sense members, including Carter, with any substantive benefits in return for association membership fees,

(7) Defendants' inducing Carter to purchase inferior insurance, by concealing and failing to disclose that the insurance purchased by Carter was issued to a non-qualifying group, namely, Med-Sense, controlled by HII, Companion Life, Allied and/or the other Defendants.

(8) Defendants failing to disclose that the insurance would be underwritten on a post-claim basis, and that there were no group insurance benefits to Carter, such as calculating the premium on the risk history of the group,

(9) Defendants reaping windfall profits at Carter's expense, by improper and illegal marketing, sales methodology, underwriting and claims handling;

(10) Defendants operating Med-Sense as a front, thereby enabling Defendants to exert their considerable insurance expertise to Carter's detriment, Without Carter's knowledge or awareness.

(11) Med-Sense being organized and operated for the benefit of Defendants and not for the benefit of Med-Sense members;

## COUNT II – BREACH OF CONTRACT

68.     Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

69.     The medical treatment Carter received claims made by the providers of Carter's received is covered under the policy of insurance and should have been paid.

70.     By denying coverage for Carter's loss, Defendants have breached the terms of the policy of insurance.

71.    As described herein, Defendants have breached the policy of insurance at issue by failing to pay benefits due under the policy.

72.    As a result of Defendants' breach of contract, Carter is entitled to any and all available compensatory damages.

## COUNT III – BAD FAITH

73.    Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

74.    An insurance contract existed between Defendants and Carter.

75.    Carter, both individually and through his providers, made claims covered under the policy and Defendants were obligated to pay such claims.

76.    Defendants intentionally refused to pay said claims.

77.    Defendants had no reasonably legitimate or arguable reason to refuse to pay the claim at the time the claim was denied.

78.    Defendants had actual knowledge that there was no reasonably legitimate, arguable or debatable reason, or it intentionally or recklessly failed to determine whether there was a legitimate or arguable reason to refuse to pay the claim.

79.     Defendants broke the obligation of good faith and faith dealing by denying and failing to pay the claim made by Carter under the applicable insurance policy.

80.     In addition to the contractual damages suffered by the Carter, the Carter also suffered emotional distress and economic loss.

81.     As a result of Defendants' bad faith refusal to pay benefits, Carter is entitled to any and all available compensatory damages, punitive damages, penalties, fees, and other relief available.

## COUNT IV – FRAUD AND SUPPRESSION

82.     Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

83.     Defendants suppressed several material facts from Carter, and also made several affirmative misrepresentations of fact to Carter, all of which Carter relied upon to his detriment and has been damaged as a result thereof.

84.     Specifically, Defendants, by and/or through an agent, told Carter in the initial telephone call those statements as laid out in Paragraphs 26 - 39.

85.     Defendants, with specific purpose, made the misrepresentations and as set out in Paragraphs 26 – 39 and the concealments as set out in Paragraphs 49-53 and Paragraphs 59 - 67 herein.

86.     Defendants, by and/or through an agent, represented to Carter that the Companion/HII/Med-Sense Group Policy coverage was much more expansive than it really was, as referenced in Paragraph 26.

87.     Specifically, Defendants suppressed and concealed the material fact that it would engage in sham benefit evaluations and investigations and reviews in order to concoct a basis to deny benefits.

88.     Defendants misrepresented, and concealed material facts as set forth above in the during the course of his coverage and claims related to the subject insurance.

89.     Defendants intended by their misrepresentations and concealments to deprive Carter of his rights and monies to which he should be entitled.

90.     As a result of Defendants' fraud and suppression, Carter is entitled to any and all available compensatory damages, punitive damages, and any forms of relief available.

## COUNT V – FRAUD IN THE INDUCEMENT

91.    Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

92.    Defendants misrepresented, and concealed material facts as set forth above in the sale of the subject insurance to Carter.  Defendants likened the policy to that of a discounted comprehensive medical insurance policy.

93.    Defendants intended by its misrepresentations and concealments to induce Carter to purchase, maintain, and/or renew the subject insurance, specifically, but not exclusively, those misrepresentations as set out in Paragraphs 26 – 39 and those concealments as set out in Paragraphs 49 - 53 and Paragraphs 59 - 67 herein.

94.    In justifiable reliance on Defendants' misrepresentations and concealments of material fact as set forth above, Carter did purchase, maintain, and renew the subject insurance and suffered damages as a result thereof.

## COUNT VI - NEGLIGENT MISREPRESENTATION AND CONCEALMENT

95.    Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

96.    Defendants had a duty to disclose fully material information concerning the insurance and the relationship of the parties, as set forth above.

97.    Defendants negligently misrepresented, concealed, and/or failed to fully disclose material facts as set forth above in the sale of the subject insurance to Carter, specifically, but not exclusively, those misrepresentations as set out in Paragraphs 26 – 39 and those concealments as set out in Paragraphs 49 - 53 and Paragraphs 59 - 67 herein.

98.    In justifiable reliance on Defendants' misrepresentations, concealments, or failure to fully disclose material fact as set forth above, Carter purchased and maintained the subject insurance and suffered damages as a result thereof.

## COUNT VII - BREACH OF FIDUCIARY DUTY BY MED-SENSE

99.    Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

100.   Med-Sense held itself out as a nonprofit association inured with the public trust and consonant with that trust are the responsibilities of a fiduciary owed to Carter.

101.   Med-Sense Guaranteed Association stood in a fiduciary relationship with Carter as the group policyholder of the subject insurance coverage and as a nonprofit association whose name connotes a guarantee of conscientiousness in its

efforts to provide quality benefits and services for its members and would investigate the providers of these benefits and services.

102.   Med-Sense breached its fiduciary duties to Carter by: (a) having a conflict of interest to unjustly enrich itself at the expense of Carter's insurance needs; (b) misrepresenting its true status, which is an entity formed for the purpose of procuring insurance; (c) concealing its relationship with HII and Companion Life, (d) agreeing to excessive economic arrangements, whereby Med-Sense's members pay more than the benefits received are worth; (e) participating in a marketing scheme, whereby Carter received none of the protections of an individual medical policy and none of the benefits of a group policy; (f) delegating non-delegable duties to adverse and commercial parties, such as HII and Companion Life (g) charging membership fees or dues for which Carter received no substantive benefits or services; and (h) declining insurance waivers or endorsements that would be beneficial to Med-Sense's members, including Carter; (i) engaging in other unfair and inequitable conduct against Carter, who has suffered damages as a reasonably foreseeable result of Med-Sense's breach of fiduciary duties, including increased premiums, impairment of credit, loss of the benefit of the bargain, loss of use of funds to pay medical expenses, debt charges, and payments made for insurance under the guise of membership fees from which Carter received no substantive benefits.

## COUNT VIII –ALABAMA TRADE PRACTICES LAW

(Alabama Code § 27-12-1, *et seq.*)

103.   Carter adopts and incorporates the allegations of the preceding paragraphs as if fully set out hereafter.

104.   Carter brings an action under Alabama Code § 27-12-1, *et seq.*, whereby Defendants, and/or by and through their agents, as delineated herein, made, issued, or caused to be made, or issued, written and/or oral statements misrepresenting or making misleading incomplete comparisons as to the terms, conditions or benefits contained in the Med-Sense/HII/Companion policy for the purpose of attempting to induce, intending to induce, and, in fact, inducing Carter to retain the insurance policy.

## COUNT IX – VIOLATION OF 18 U.S.C. 1964 (C)

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)

105.   Carter adopts and incorporates the allegations of the preceding paragraphs as if fully set out hereafter.

106.   Carter brings an action under 18 U.S.C. 1964 (c) for violations of the "RICO" Act, whereby Defendants conducted or participated in the conduct of an enterprise through a pattern of racketeering activity.

107.   Defendants, on numerous occasions, but on at least two separate occasions (two predicate acts) within ten years (in this case in the same year), engaged in racketeering activity, namely wire fraud, to wit: (1) Defendants knowingly devised or participated in a scheme to defraud Carter and others, (2) Defendants did so knowingly with intent to defraud, and (3) Defendants used interstate wires for the purpose of executing the scheme.

108.   Defendants created and maintained an enterprise – an ongoing organization, formal or informal, where the various associates function as a continuing unit.

109.   Defendants' enterprise existed for the common goal of engaging in the violations of law as enumerated and described herein, specifically in Counts I-XIII & Count X.

110.   This association of entities furnished a vehicle for the commission of Defendants' two or more predicate crimes as enumerated and described herein, specifically in Counts I-XIII & Count X.

111.   Defendants used interstate wires to engage in wire fraud as described in 18 U.S.C. 1343 by using telephone, email, electronic payment processing and electronic communications via internet.

112.    Defendants, devising a scheme or artifice to defraud, transmitted by means of wire "any writings, signs, signals, pictures or sounds" for the purpose of executing such scheme.

113.    Such fraud was committed during the fraudulent and misrepresentative communications by Defendants using interstate wires as set out herein, on the dates and in the manner set out herein.

114.    Said fraudulent transmissions caused great injury to Carter.

115.    Carter's injury was incurred by reason of the substantive RICO violation.

## COUNT X - FICTITIOUS PARTIES

116.    Fictitious Party 1 was that entity which owned and/or operated the named party defendant entities.

117.    Fictitious Parties 2 & 3 were those persons or entities which caused or contributed to cause the actions and in the complaint that resulted in the Carter's injury.

118.    Fictitious Party 4 was the principal of another defendant and is therefore liable for the negligent and/or wanton acts of its agents.

119.   Fictitious Party 5 was the predecessor in interest of another defendant and therefore is responsible by contract or operation of law for that defendant's negligent and/or wanton acts.

120.   Fictitious Party 6 was the successor in interest of another defendant and by contract or operation of law assumed the liabilities of another defendant; all of whose true and correct names are otherwise unknown to Carter at this time but will be added by Amendment when properly ascertained.

121.   As described above, Fictitious Parties 1, 2, 3, 4, 5 & 6 proximately caused damages to Carter.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff Jeremy Carter demands, on all counts enumerated herein and for all causes of action expressed herein:

I.     Compensatory and punitive damages against the named Defendants and fictitious-party defendants in an amount to be determined by the trier-of-fact, including interest, costs, and attorney fees;

II.    Additionally, as to Count VIII, Carter demands damages as available under 18 U.S.C. 1964(c), along with compensatory and punitive damages against the named Defendants and fictitious-party defendants in an amount to be determined by the trier-of-fact, including interest, costs, and attorney fees;

III.    Any such other, further and different relief as is available to Carter.


Respectfully Submitted,

s/ Trey J. Malbrough
Trey J. Malbrough
Bar Number: ASB-2898-R46M
Attorney for Plaintiff Jeremy Carter
The Malbrough Firm LLC
Post Office Box 531383
Birmingham, Alabama 35253
T: (205) 701 - 0707
F: (205) 820 - 0123
E: trey@tmbfirm.com


s/ Michael W. Whisonant, Jr.
Michael W. Whisonant, Jr.
Attorney for Plaintiff Jeremy Carter
Jaffe, Hanle, Whisonant & Knight, P.C.
2320 Arlington Avenue, South
Birmingham, Alabama 35205
T: (205) 930-9800
F: (205) 930-9809
E: mhanle@rjaffelaw.com


## JURY DEMAND

**PLAINTIFF JEREMY CARTER DEMANDS A TRIAL BY STRUCK JURY.**

s/ Trey J. Malbrough
Trey J. Malbrough

s/ Michael W. Whisonant, Jr.
Michael W. Whisonant, Jr.

*Attorneys for Plaintiff Jeremy Carter*