FILED

2020 Sep-17  PM 10:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JEREMY CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:18-cv-350-JEO |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| COMPANION LIFE INSURANCE | ) | |
| COMPANY, HEALTH INSURANCE | ) | |
| INNOVATIONS, INC., | ) | |
| ALLIED NATIONAL, INC., and | ) | |
| MSGA GUARANTEED | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendants. | ) | |

## SECOND AMENDED COMPLAINT

1.      Plaintiff Jeremy Carter hereby files the following Amended Complaint against Defendants Companion Life Insurance Company, Health Insurance Innovations, Inc., Allied National, Inc. and Med-Sense Guaranteed Association, and alleges as follows:

### Parties

2.      Plaintiff Jeremy Carter ("Carter") is an adult citizen of Shelby County, Alabama.

3.      Defendant Companion Life Insurance Company (hereafter "Companion Life") is a business incorporated under the laws of South Carolina, with

its principal place of business in South Carolina, and transacting business in Alabama.   Companion Life is an insurance company licensed to sell certain insurance products in Alabama but, upon information and belief, it is not licensed to sell health insurance.

4.      Defendant Allied National, Inc. (hereafter "Allied") is a business incorporated under the laws of Missouri, with its principal place of business in Kansas, and transacting business in Alabama.

5.      Defendant Health Insurance Innovations, Inc. (hereafter "HII") is a business incorporated under the laws of Delaware, with its principal place of business in Tampa, Florida, and transacting business in Alabama.  Defendant Health Insurance Innovations, Inc. ("HII") is doing business as "HiiQuote.com".

6.      Defendant Med-Sense Guaranteed Association (hereafter "MSGA") is a business incorporated under the laws of Delaware, with its principal place of business in Missouri, and transacting business in Alabama.  MSGA purports to be not-for-profit business incorporated in Illinois and transacting business in this state and jurisdiction.

## JURISDICTION AND VENUE

7.      <u>Jurisdiction.</u>  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332.   The Plaintiff, Jeremy Carter, is of diverse citizenship

from the Defendants and the matter in controversy exceeds the sum or value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.  This Court has supplemental subject matter jurisdiction over Plaintiff's claims arising under Alabama law because those claims arise from the same nucleus of operative fact, i.e., the Defendants' creation, marketing, and sale to Plaintiff of the insurance policy at issue, and the subsequent administration of that policy.

8.   <u>Personal Jurisdiction.</u>   The Court has personal jurisdiction over Defendants because the creation, marketing, and sale of the insurance policy at issue, and the processing of payments for such policy, were directed toward Alabama residents, including Plaintiff, an Alabama resident, who was residing in this District at the time of the events at issue.   Defendants derive revenue from Alabama residents, and sell their goods and services to Alabama residents, including Plaintiff.

9.   Venue is appropriate under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to this claim – the marketing to, and the sale of, goods and services directed at Alabama resident, including the Plaintiff – occurred in this District and because Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

### Background

10.     Health insurance scams exist because there is an unmet need for affordable coverage.  Those that operate phony health plans market a low-priced, comprehensive coverage option. Historically, scams have proliferated when insurance premiums increase substantially.[1]

11.     Unauthorized health insurance companies intentionally fail to comply with state and federal law regarding insurance regulation; they collect premiums for nonexistent health insurance.  Unauthorized health plans attract business by undercutting competition with low prices and accepting enrollees without medical underwriting, regardless of their past or present medical conditions.  They do not pay claims, and, ultimately, they leave patients with millions of dollars in medical bills.

12.     It is illegal in every state to operate an insurance company without a license.  By not obtaining a license, unauthorized insurers are able to avoid compliance with important consumer protections, including solvency standards that ensure a company will be able to pay claims, safeguards for vulnerable populations

---

[1] <u>Health Insurance Scams: How Government Is Responding and What Further Steps Are Needed</u> The Commonwealth Fund, Task Force on the Future of Health Insurance, Health Policy Institute, Georgetown University (August 2003).
https://www.commonwealthfund.org/sites/default/files/documents/___media_files_publications_issue_brief_2003_aug_health_insurance_scams__how_government_is_responding_and_what_further_steps_are_needed_kofman_insurancescams_ib_665_pdf.pdf

(e.g., children with disabilities), states' health coverage continuation and conversion laws, and other consumer protections.

## "Group" or "Association" Health Plans

13.     Millions of Americans with private health insurance are covered through group-purchasing arrangements such as associations and purchasing coalitions that offer health coverage to employers, self-employed people, and, in some cases, individual members.  Most are private, typically involving an association that either endorses, negotiates, or self-insures health coverage for members.  Although many associations are independent, some are affiliated, managed, or owned by insurers that set up associations as marketing vehicles to benefit from less restrictive state laws where applicable.

14.     Association health coverage has been especially popular with individual consumers because of a presumption that large groups have more market clout and negotiating power than small groups or individuals, a promise of better rates and benefits, and, in some cases, a promise of more consumer protections than are available in the individual market.

15.     Association coverage for employers must comply with both state and federal requirements.  Non-job-based association health insurance is regulated primarily by states.  Rate and form filings allow state regulators to evaluate whether

insurers are complying with state standards and to prevent potential problems before noncompliant products are sold and before premium rates are increased inappropriately.

16.     Pursuant to Alabama Code § 27-14-8, association insurance issued by an out of state entity is exempt from the requirements of filing forms for approval by the Commissioner of Insurance.  At the time of the events that form the basis of this lawsuit, association coverage was also exempt from the filing of rates for review by Alabama insurance regulators.   Additionally, there remains little to no enforcement by Alabama of few minimum requirements on the books.

## SHORT-TERM MEDICAL PLANS

17.     Short-term medical insurance plans are designed to provide protection when a person experiences a temporary gap in comprehensive coverage, such as when transitioning between jobs.

18.     Prior to health reform, insurers in the individual market had wide latitude to deny coverage, charge an unaffordable premium, or limit benefits based on a person's medical history.  As a consequence, individual market health insurance routinely proved inadequate for consumers' health and financial needs and was often inaccessible to those with even minor health problems.  The Affordable Care Act (hereafter "ACA") established numerous consumer protections designed to make it

easier for consumers in the individual market to access affordable, adequate health insurance. The ACA requires insurers that sell individual health insurance to offer coverage to all individuals regardless of health status, requires coverage of preexisting conditions, and prohibits insurers from charging higher premiums based on a person's medical history or gender.  It also includes limits on cost-sharing and requires insurers to cover a minimum set of essential health benefits.

19.     Short-term medical insurance plans, which predate the ACA, are not considered to be individual health insurance under federal law and are exempt from the ACA's consumer protections.  Consequently, short-term plans typically provide coverage far skimpier than ACA-compliant policies: they may decline to cover preexisting conditions, exclude essential health benefits, and impose dollar limits on coverage. However, low premiums may make these policies attractive to healthy consumers. And they are much more profitable for insurers than coverage that meets federal consumer protections.

**The HII Model**

20.     HII describes itself as follows in its 2012 Form S-1 Registration Statement with the Securities and Exchange Commission:

"We are an industry leader in the sale of 12-month short term medical, or STM, insurance plans, an alternative to traditional Individual Major Medical,

or IMM, plans. STM plans generally offer qualifying individuals comparable benefits for fixed short term durations at approximately half the cost of IMM plans, which provide lifetime renewable coverage." (HII Form S-1 (SEC filed Dec. 20, 2012) p.15)

21.    "We provide our members with easy access to health insurance coverage at an affordable price. For qualifying individuals, our STM plans offer benefits comparable to traditional IMM plans at approximately half the cost." (HII Form S-1, p.4)

22.    HII is aware that its business model exists due to the availability of regulatory loopholes in consumer protections.  HII lays out the following in its 2012 Form S-1 Registration Statement with the Securities and Exchange Commission, under the heading "Risks Relating to Our Business and Industry":

"Our STM plans are currently classified as "short-term limited duration" plans under Healthcare Reform. Accordingly, "short-term limited duration" plans are exempt under Healthcare Reform from the minimum MLR thresholds and "must-carry" preexisting conditions requirements, the requirements for the extension of dependent coverage, certain documentation, reporting and appeals process requirements and the prohibitions against excessive waiting periods, lifetime or annual limits, rescissions and more generally,

discrimination against individuals and discrimination on the provision of
health care. If our STM plans were no longer classified as short-term limited
duration plans, or we were not able to take advantage of certain current
exemptions for any other reason, our business could be negatively affected."
(HII Form S-1, p.15)

23.    HII preys on those members of the population most vulnerable to the
promise of low-cost, major medical insurance coverage.  HII unabashedly lays out
its façade and the groups of the potential exploited in its own words:

"We focus on the large and underpenetrated segment of the U.S. population
who are uninsured or underinsured, which includes individuals who are
unable to afford traditional IMM premiums and underserved "gap
populations" that require insurance due to changes caused by life events, such
as new graduates, divorcees, early retirees, military discharges, the
unemployed, part time and seasonal employees and temporary workers. Our
target market consists of approximately 64 million Americans, including
approximately 50 million Americans who were uninsured in 2010, according
to the U.S. Census Bureau, and approximately 14 million nonelderly
Americans who purchased individual health insurance plans in 2010,
according to a 2010 Kaiser Family Foundation survey.  As of September 30,

2012, we had approximately 24,416 STM members. We expect the number of uninsured and underinsured to significantly increase due to the rising costs and burdensome underwriting requirements of traditional IMM plans and a decline in employer-sponsored health insurance programs." (HII Form S-1, p.2)

24.    HII's target market listed above – those who "require insurance due to changes caused by life events" are those individuals and families scrambling for a solution in light of the terrifying prospect of being without medical insurance in the United States.

25.    The ACA then presented a boon of opportunity for HII.  HII continues in its 2012 S-1 about its business prospects:

"According to a 2011 McKinsey survey, the implementation of Healthcare Reform will likely increase the number of Americans in the individual health insurance market from 14 million to more than 100 million starting in 2014. We believe this increase will be primarily driven by two key factors: employers dropping group coverage and an additional 45 million uninsured Americans entering the individual insurance market. The McKinsey survey estimates that approximately 30% of employers would "definitely" or "probably" drop employer-sponsored insurance starting in 2014.  Assuming a

30% drop in employer-sponsored insurance, approximately 50 million Americans would join the individual health insurance market starting in 2014. In addition, because Americans will face penalties if they are uninsured, we expect that a large number of the current uninsured population of 50 million will enter the individual health insurance market." (HII Form S-1, p.2)

26.    HII's above calculation of millions of potential new customers comes from two sources outside of the baseline underinsured:

(a) Individual employees losing their health insurance provided by, or obtained through, their employer, in which case such insurance was major medical insurance, met ACA minimums, and was likely obtained by the employee through an employer-sponsored "group plan."  In this case, the lamentable loss of coverage for millions will push them into the private consumer arena where HII may exploit employees' familiarity with terms like "group" insurance, and where HII may "aggressively pursue opportunities to help consumers identify our STM products as the right choice for healthcare" (HII Form S-1, p.3)

(b) "In addition, because Americans will face penalties if they are uninsured, we expect that a large number of the current uninsured population of 50 million will enter the individual health insurance market."  HII mentions

these hapless potential marks, who it may be inferred are scared of federally imposed penalties for not having insurance, as potential customers – even though the very next paragraph describes how HII has an opportunity to increase market share because they don't have to deal with all those stuffy rules like real insurance does:  "For example, the minimum MLR thresholds require that IMM carriers use 80% of all premiums collected to pay claims. (HII 2012 Form S-1, p.2).   The opportunities present due to low overhead exist precisely because HII does not offer plans which satisfy ACA requirements, and therefore HII can do nothing for those individuals fearing penalty for being uninsured.

27.     HII states the following about educating its customer base:

"Our business may not grow if individuals are not informed about the availability and accessibility of affordable health insurance.  Numerous health insurance plans and products are available to individuals in any given market. Most of these plans and products vary by price, benefits and other policy features.   **Health insurance terminology and provisions are often confusing and difficult to understand.** As a result, researching, selecting and purchasing health insurance can be a complex process. We believe that this complexity has contributed to a perception held by many individuals that

individual health insurance is prohibitively expensive and difficult to obtain.
If individuals are not informed about the availability and accessibility of
affordable health insurance, our business may not grow and our results of
operations and financial condition would be harmed." (HII Form S-1, p.20)

28.    HII's focus on an "under-penetrated segment" who are "unable to
afford traditional IMM premiums" is due to more calculations on human frailty:
"Based on these figures, we estimate that a sizable portion of the uninsured
population chooses not to purchase insurance primarily due to its high cost." (HII
Form S-1, p.2)

29.    HII exploits the opportunity to teach customers an aggressive lesson
about short-term medical insurance: "We provide our members with easy access to
health insurance coverage at an affordable price. For qualifying individuals, our
STM plans offer benefits comparable to traditional IMM plans at approximately half
the cost." (HII Form S-1, p.4). The unamusing reality is that STM and MMI plans
are as comparable as apples and oranges.

30.    HII also "expects the number of uninsured and underinsured to
significantly increase due to the rising costs and burdensome underwriting
requirements of traditional IMM plans…" (HII Form S-1, p.2). Here, HII identifies
another source of potential customers – people who did or do have insurance, but

who were or are no longer able to afford it.   These individuals, almost certainly also at a vulnerable time in life, are prime targets for a contrived fleecing once HII's offers the security blanket of a policy that offers comparable coverage for half the price.

### The HII / MSGA / Carrier Relationship

31.    MSGA is an integral part of the concerted scheme.  MSGA is the conduit through which the entire operation functions.

32.    Our ability to offer our services and operate our business is therefore dependent on maintaining our relationships with third party partners, particularly MedSense…"  (HII Form S-1, p.15).

33.    The above statement exposes the crucial point that HII and Med-Sense co-exist.  They use each other, and the joint dynamic as a way to create a product that avoids regulation.

34.    "We depend on a number of third-party relationships to enhance our business.  For instance, state regulations may require that individuals enroll in group programs or associations in order to access certain insurance products, benefits and services. We have entered into relationships with such associations in order to provide individuals access to our products. For example, we have an agreement with Med-Sense Guaranteed Association or Med-Sense, a nonprofit association that

provides membership benefits to individuals and gives members access to certain of our products. Under the agreement, we primarily market membership in the association and collect certain fees and dues on its behalf. In return, we have sole access to its membership list, and Med-Sense exclusively endorses the insurance products that we offer." (HII Form S-1, p.16).

35.     HII's misstatement of reality shows the nature of this conspiracy – using the phrase, "state regulations may require that individuals enroll in group programs" to describe the reality that group insurance products may avoid state regulation if they meet the specific criteria, and that HII and MSGA created insurance products which fit into that criteria for the sole purpose of avoiding state regulations, is disturbing.  Neither Alabama nor any other state is pushing group association memberships.  **HII's Form S-1 is replete with statements about how their business model is profitable because they don't have to deal with state or federal regulations.** (HII Form S-1).

36.     MSGA is the vessel through which the HII scheme functions.  "For the month of September 2012, approximately 81.7% of our business was derived from individuals who became members of MedSense." (HII Form S-1, p.16).

37.     HII would crumble if its shield from regulation and oversight were to fall.  "While we believe we could replace MedSense with other group programs or

associations, there can be no assurance we could find such a replacement on a timely basis or at all. If we were to lose our relationship with MedSense and were unable to find another group program or association on a timely basis or at all, this would have a material adverse effect on our business." (HII Form S-1, p.16).

38.    Under an agreement between MSGA and HII, HII exclusively markets and administers MSGA memberships and collects fees and dues on behalf of MSGA.

39.    "In consideration of the covenants contained herein; and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Association hereby authorizes Company and Company hereby agrees to accept exclusive authorization by Association to procure new members for Association and to market the benefits and products of the Association. Further, the Association authorizes Company and Company hereby agrees to accept authorization by Association to collect and remit, or provide for the collection and remittance of, dues owing by Association members to Association."[2]

---

[2] MARKETING/BILLING AGREEMENT between MedSense Guaranteed Association and Health Insurance Innovations, Exhibit 10.13. to HII's 2012 Form S-1
https://www.sec.gov/Archives/edgar/data/1561387/000095010312006865/dp34690_s1.htm

40.     HII is the exclusive mode and method through which MSGA procures new members and markets the MSGA.  MSGA is the integral part of HII's product, without which HII could not function.

41.     Companion Life is aware of the scheme and accepts the benefit of such. "We design and structure insurance products on behalf of insurance carriers."

42.     HII admittedly is not licensed to sell insurance and is aware of its requirement to be licensed by a state to sell insurance.

43.     HII sells its products through a network of sales agents it calls "Distributors."  HII provides these Distributors "selling tools" (Form S-1, p.4) and provides "health insurance plan information in the scripts used by our customer call center partners." (Form S-1, p.21)  HII even has a compliance program where it scores calls based on script adherence.  (Form S-1, p.5)

44.     The sales agents or "Distributors" are well-paid for their malfeasance, offering advance commissions to "independent brokers", all of which is almost unheard of in the industry:

"Our Distributors. At a time when commission rates on many health insurance products, including traditional IMM plans, are declining, we provide our distributors with specialized, highly sought-after product offerings and a compensation structure

characterized by attractive commission rates and advance payments." (HII Form S-1, p.3-5).

45.     Defendants advertise on the internet at www.hiiquote.com.   Upon information and belief, a substantial majority of HII's targeted consumers are obtained through internet marketing, specifically targeting those consumers searching for terms such as "Blue Cross Blue Shield," a true major medical insurance plan, and using agents to market and sell their products.

46.     Defendants entered into an agreement and arrangement among and between one another, wherein Defendants would market the MSGA/HII/Companion "group" medical insurance policies to the buying public.

47.     That had the plaintiff known and fully understood how his monthly payment was allocated, he would have bought another policy and would not have purchased this one.

48.     HII entered into an Agency Agreement with Companion Life whereby HII served as the agency for the marketing, production, underwriting, servicing, and administration of the short-term medical insurance policy at issue in this matter.

49.     Under an agreement among and between Companion Life, Med-Sense and HII, HII secures underwriting by Companion Life for MSGA

group health insurance plans, issued to MSGA, and collects fees and dues on behalf of Companion Life and MSGA.

50.    Allied acted as a third-party administrator handling claims submitted under the insurance underwritten by Companion Life.  That is, pursuant to a third-party administrator agreement, Allied acted on behalf of Companion Life with respect to the handling of claims made under the short-term medical insurance policy business at issue in this matter.

51.    At all relevant times, each and every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants. Carter is informed and believes that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

52.    Defendant MSGA was formed for the improper purpose of selling health insurance nationally to the insurance buying public.  The health insurance sold by MSGA and its agents is purposefully bundled with other purported "benefits," such as travel discounts or pre-paid legal services, to obfuscate the MSGA's *actual* purpose of selling health insurance under the auspices of a "group association" or "group benefit," thus fostering a belief in consumers that the MSGA

coverage is "group" coverage with benefits and protections similar to job-based group insurance.   These types of associations must be organized for a specific purpose *other* than to sell health insurance in order to qualify as bona fide group insurance.   When coverage is sold through national associations, almost no consumer protections apply.

53.   Consumers to whom Defendants market are deceptively upsold on non-insurance products, such as memberships in MSGA's "discount" plans. *See* State of Alaska Department of Commerce, Community & Economic Development, *The Division of Insurance Cautions Alaskans that Short-Term Health Insurance Is Not ACA Compliant* (Dec. 15, 2015) ("Health Insurance Innovations (HII) is an entity registered in Florida that is contacting consumers by telephone. The Division of Insurance records reflect that HII and agents known to be selling its products are not licensed in Alaska to sell insurance; their sales activities are in violation of Alaska licensing insurance statutes. The review by the Division of Insurance also noted that consumers purchasing products from HII were unknowingly purchasing membership in a non-insurance discount program called the MSGA Guaranteed Association."[3]

---

[3] *See* HII Form S-1 (SEC filed Dec. 20, 2012) ("[W]e have an agreement with … Med-Sense, a non-profit association that provides membership benefits to individuals and gives members access to certain of our products. Under the agreement, we primarily market membership in the association and collect certain fees and dues on its behalf. In return, we have sole access to its membership list, and Med-Sense exclusively endorses the insurance products that we offer.")

54.     The Defendants operate by issuing, causing to issue, maintaining and/or facilitating purported "Group Policies" in the name of MSGA that supposedly allow affordable, quality health insurance. This/these "Group" policies were created for the purpose of selling medical insurance policies which are not subject to regulation.

55.     In other words, implicit in the formation and operation of MSGA is its purpose of being the legal entity which facilitates the issuance of a "Group" policy of health insurance.

56.     Thereafter, MSGA, by and through the other Defendants, sells memberships so that it can sell to an unknowing and unwitting public sham health insurance in the guise of "major medical" coverage, all the while disguising, among other things: (a) the full and true nature of the relationship between the Defendants; (b) that MSGA is not an association formed in good faith for purposes other than procuring insurance, (c) that MSGA is acting in the interests of itself and its Co-Defendants rather than its "members"; (d) to charge undisclosed premiums, association fees, membership dues, administrative and processing fees, and provide kickbacks among each other.

---

(https://www.sec.gov/Archives/edgar/data/1561387/000095010312006865/dp34690_s1.htm).

57.     MSGA's membership consists of insurance consumers who are seeking, and who believe they are buying, real, beneficial, individual health insurance.  Defendants' targeted consumers were not previous members of the MSGA, but instead automatically became members of MSGA when they purchased the health insurance at issue herein.

58.     Defendants, in conspiracy and conjunction with each other, intentionally played upon the vulnerabilities of people who either could not qualify for or could not afford traditional health insurance coverage by falsely representing the MSGA/Companion Life policies as a low-cost way to obtain such coverage.  The deception arises from MSGA's affiliation with the product. Health insurance policies offered by associations are perceived by the public to be bona fide health insurance, much like the kind of real health insurance offered by employers.   Defendants intended to create a false impression of the Companion Life/MSGA/HII plan by calling it "group" insurance.

59.     As referenced in the Form S-1, these are not arms-length business transactions, but are an intricate web, purposely spun to ensnare the Plaintiff and other individuals.

60.     "In March 2008, we entered into a relationship with MedSense Guaranteed Association, or MedSense, a nonprofit Association that provides

membership benefits to individuals and gives members access to certain of our products. Michael D. Hershberger, our Chief Financial Officer and one of our director nominees, was president of MedSense until October 2011, when he resigned as president and joined us as one of our officers."

### The HII Method

61.     Defendants sell their policies through an agent using their touted "cloud-based platform" (Form-S-1), whereby applicants can get an instant underwriting decision without any paperwork. Like Plaintiff Carter, the sales agent uses a script or set of sales guidelines to draw comparisons for the consumer between STM and MMI, all the while not disclosing basic coverage information.

62.     The Distributors take payment for policies over the phone through instant ACH or credit card debits. This is all done prior to the customer ever reading any policy documents or even seeing the application. Once payment is processed,

63.     Defendants avoid regulations in Alabama and requiring premiums be detailed in policy documents.

64.     In this way, the allocation of fees between insurance and MSGA is veiled. Consumers such as Plaintiff, who only want insurance, won't see the

split between the two, and will not be placed on notice that they are paying for something they don't want.  More to the point, and most disturbing of all, the concealment of the allocation of fees is done because the presence of such a built-in cost – almost half of the total – would cause a consumer to ask questions, and it would have caused Mr. Carter to ask questions about the nature of the insurance plan.  Concealing the fee split is a way for the Defendants to conceal their fraud.

65.    HII offers a 10 calendar day cancellation period, but by its own policy documents, informs the consumer that policy documents will be mailed in 7-10 business days.  This targeted marketing at unsavvy, online consumers allows agents to spin the benefits of the policy as is convenient, have customers answer only a few questions for "approval" before the agent charges the first premium, all without the consumer being aware of exactly what is it they are purchasing.

66.    Although all insurance carriers must first have their contracts and plans of business approved in writing by the Commissioner of the Department of Insurance of Alabama, none of the Defendants herein have complied with such requirements, with regard to this or any other policy.

**All Defendants are aware of the ruse – everybody gets paid**

67.     "We design and structure insurance products <u>on behalf of insurance</u> <u>carrier companies</u>, market them to individuals through our large network of distributors…"

68.     Companion Life is aware of the scheme, and indeed participated in its creation and/or maintenance, to defraud and participates due to the windfall profits obtained.  As outlined in HII's Form S-1, the business model has an incredible profit margin as compared to "traditional" medical insurance.

69.     "In the ordinary course of operating our business, we have received complaints that the information we provided was not accurate or was misleading. Although in the past we have resolved these complaints without significant financial cost, we cannot guarantee that we will be able to do so in the future."  (Form S-1, p.21)

70.     Companion Life understands that HII will garner it the choicest uninsured

71.     Defendants regularly communicated with one another regarding performance and marketing strategies, designing, coordinating, monitoring and sharing marketing scripts, plans, techniques, and designs; and, in the case of HII and MSGA, exclusively marketing each other's products to potential customers.

72.     Companion Life, MSGA and Allied participate in the creation of content of their agents' sales techniques, scripts, and advertising, all with the purpose of selling an inferior product in a fraudulent manner.  At the time coverage issued, these entities knew they were selling an inferior product of little to no value and were being unjustly enriched, and at the same time had an intent to deceive and not honor the obligations under the policy, or those obligations as stated by the agent.

73.     A key aspect of the "Distributor's" (agent's) sales technique, script, and advertising, is promoting the illusion to the consumer, as it was done to Plaintiff Carter, that he is calling a Broker – an independent agent offering some type of choice among choices.  Part of the way this inferior product is sold in a fraudulent manner is allowing the consumer to believe, as Carter believed, that the HII/Defendants' agent was finding him options, not directing him to one option.

74.     Defendants knew (or reasonably should have known) that their agents were violating the law on their behalf, and failed to take effective steps within their power to force the agents to cease that conduct.

75.     The policies marketed and sold by Defendants contain a host of exceptions to coverage that are not articulated to consumers prior to or during the application process.  Indeed, their online promotional materials and telephone agents

made representations to applicants, including Carter specifically, that coverage is much more expansive than it really is.

76.    Companion Life has a long-standing relationship with HII. Companion Life knew at the time coverage was issued to Carter that it intended that it would not pay him benefits regardless of a claim's validity.

77.    Upon information and belief, HII received significant commissions, fees, and/or other compensation, both directly and indirectly, in connection with the enrollment of Plaintiff Carter and numerous others in MSGA.

78.    Upon information and belief, HII received significant commissions, fees, and/or other compensation, both directly and indirectly, in connection with the placement of Plaintiff Carter and numerous others with the HII/Companion Life short-term medical insurance policy associated with MSGA.

79.    Upon information and belief, MSGA received significant commissions, fees, and/or other compensation, both directly and indirectly, as a result of the sale of placement of Plaintiff Carter and numerous others with the HII/Companion Life short-term medical insurance policy associated with MSGA.

80.    Upon information and belief, all Defendants received significant commissions, fees, and/or other compensation, and/or materially benefitted, both directly and indirectly, as a result of the sale of placement of Plaintiff Carter and

numerous others with the HII/Companion Life short-term medical insurance policy associated with MSGA.

## Vicarious Liability of Defendants

81.    Defendants exercised these rights during the course of their relationship with each and every Co-defendant.

82.    Defendants market the products and services of each and every other Defendant.

83.    As agents of one another, each and every defendant is directly responsible for the actions of every other Defendant.

84.    Each and every Defendant also ratified the actions of every other defendant by knowingly accepting the benefits of each Defendant's activities by accepting applications and customers from each other, specifically as to the application and subsequent ensnaring of Carter as a new customer.

85.    Through this ratification, each and every Defendant is vicariously liable for the actions of each and every Co-defendant.

## FACTS RELATING TO PLAINTIFF

86.     On March 4, 2016, Carter performed a Google search of "Blue Cross Blue Shield," and one of the results directed Carter to HII/Defendants' website/telephone number.

87.     Carter thereafter called HII/Defendants to inquire about purchasing an individual health insurance policy.

88.     In the course of Carter's discussion with the HII/Defendants' agent, Carter stated that he was seeking to obtain an individual health policy to cover his medical needs and told the agent that he had searched "Blue Cross Blue Shield Alabama" on Google and found the information which led him to call HII Defendants (or an HII agent and/or an agent of another party Defendant).

89.     During the telephone call on March 4, 2016, Defendants, by and through an HII agent and/or an agent of another party Defendant, induced Carter to purchase the MSGA/Companion Life policy with misleading words and phrases, including the promise that the policy pays benefits like a "major medical insurance plan...."

90.     The HII/Defendants' agent informed Carter that HII could find a health insurance policy for Carter that would satisfy his medical needs.  The agent ultimately indicated that a health insurance policy underwritten by Companion Life

was available to satisfy Carter's medical insurance needs.  The HII/Defendants'
agent informed Carter that the Policy covered everything "except pregnancy and
rehab."

91.    Carter justifiably and reasonably relied on the agent's oral
representations.

92.    Carter was assured by the HII/Defendants' agent that he qualified for
the Companion Life medical insurance policy, which included up to $1,000,000 in
coverage with a $2,500 deductible.

93.    During this phone call, Carter was instructed to provide answers to a
series of questions asked by the representative on the call.  Carter did not have any
application or underwriting documents or screens available to him to read himself
during this process.

94.    Carter answered all of the questions that he was asked by the
HII/Defendants' agent honestly, completely, and to the best of his knowledge and
ability.

95.    Carter was not provided with a physical or electronic version of an
insurance application to review or sign.

96.     Carter was not provided with a physical or electronic version of an application to review or sign, either for the Companion Life Policy, or for the MSGA membership.

97.     HII/Defendants' agent assured Carter that he qualified for the MSGA/Companion Life medical insurance policy.   At some point, the HII/Defendants' agent completed and submitted, on behalf of Carter, an "application" for health insurance coverage for the Companion Life policy and an "application" for MSGA membership.

98.     HII/Defendants' agent stated to Carter that his MSGA Group insurance policy would include extra benefits, such as discounts on travel and health services. Carter specifically stated that he was not interested in those services, only that he was calling for purposes of obtaining health insurance.

99.     HII/Defendants' agent then quoted Carter a monthly premium payment in the amount of $277.34.   HII/Defendants' agent did not tell Carter that only $102.34 went to the monthly health insurance premium, and that the majority of his payment ($175.00) went toward membership/service fees that Carter was not interested in, specifically stated that he was not interested in, and was not aware were packaged in the guise of a medical insurance policy.

100.   The HII/Defendants' agent processed Carter's first payment immediately over the telephone.  At this time, Carter was relying on the statements made by the agent pertaining to coverage and had not seen the policy documents or any application.

101.   At that time, Carter was under the impression that all premium went to health insurance premium.

102.   Thereafter, Carter became insured under a medical insurance policy issued by Companion Life to MSGA and administered by HII and/or Allied.

103.   Carter was never delivered a copy of the insurance policy or of any application.

104.   In the spring/summer of 2016, Carter spent time at Shelby Baptist Medical Center for health issues.  Carter underwent certain treatment and procedures as a result of these issues.

105.   Bills for the hospitalization, care, and treatment associated with Carter's medical issues/treatment in the spring/summer 2016 were submitted to Defendants for claim payment.

106.   During the year 2017, Carter was made aware that all charges submitted to Defendants by all providers had been denied, and that all medical bills incurred during the term of his policy had been sent to collections.

107.   Carter attempted numerous times to contact Defendants by calling telephone numbers listed on his insurance cards, to no avail.  Each time he would call, he was faced with long hold times, transfers, disconnections and other elusive behavior designed to frustrate customers and elude the Defendants' obligations.

108.   Defendants' actions in this regard are not random or isolated, but rather are a part of a pattern and practice by Defendants of communicating to potential and current policyholders that policies will meet their needs, then denying most, if not all, claims on the basis of pre-existing conditions or other grounds, and making any challenge of such denial untenable.

109.   Defendants agreed to, and participated in, a scheme, pattern, and practice to systematically deny and/or delay payment of claims made for benefits under Carter's policy and under the policies of others.

110.   The scheme, pattern, and practice to deny and delay claims, like Carter's claims, included, but was not limited to: (a) making it difficult for consumers to determine which entity or which person within which entity was responsible for responding to or answering questions about claims; (b) routinely

denying claims by misapplication of the pre-existing condition limitation.  These practices were employed by Defendants with the intended purpose of denying claims and benefit payments.

111.   Defendants further engaged in a scheme, pattern, and practice to sell as many Companion Life/HII/MSGA policies as possible, and then improperly employ reverse underwriting tactics and sham investigations, both themselves, and by and through Allied, designed to deny most, if not all, claims on the basis of pre-existing conditions or other grounds.

112.   Defendants further engaged in a scheme, pattern, and practice to sell as many Companion Life/HII/MSGA policies as possible for the purpose of enriching themselves by wrapping membership fees, dues, and other hidden self-serving costs into the amount of the premiums both quoted to, and paid by, Plaintiff and others.

113.   Defendants had no arguable or legitimate basis to deny Carter's claims. Defendants' denial of Carter's claim was made in violation of his insurance contract and in bad faith.

114.   Defendants knowingly defrauded Carter by selling him, and causing to be sold to him, a proverbial "bill of goods."

115.   Defendants preyed on Plaintiff and others seeking medical insurance, by and through the actions of each other Defendant and their agents.

116.   Carter was a victim of these improper practices and has been financially damaged thereby.  Additionally, Defendants' conduct caused Carter to suffer mental anguish and emotional distress.

## COUNT I – CIVIL CONSPIRACY
### (Against All Defendants)

117.   Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

118.   Defendants have engaged in an unlawful conspiracy to commit fraud and misrepresentation by participating in the creation of content of their agents' sales techniques, scripts, and advertising, all with the purpose of selling an inferior product in a fraudulent manner.  At the time coverage issued, these entities knew they were selling an inferior product of little to no value and were being unjustly enriched, and at the same time had an intent to deceive and not honor the obligations under the policy, or those obligations as stated by the agent.

119.   Defendants have engaged in an unlawful conspiracy to commit fraud and misrepresentation, by and/or through agents, by:

      a.   Falsely representing to consumers that the Policy covered "everything except pregnancy and rehab."

b. Failing to disclose to consumers a host of exceptions to coverage and the existence of exclusions for pre-existing conditions.

c. Intending at the time of the sale of the Policy to consumers that no benefits would ever be paid under the Policy, regardless of the validity of claims.

120. Defendants, by and/or through an agent, did:

a. Falsely represent to Carter that the Policy covered "everything except pregnancy and rehab."

b. Fail to disclose to Carter a host of exceptions to coverage and the existence of exclusions for pre-existing conditions.

c. Intend at the time of the sale of the Policy to Carter that no benefits would ever be paid under the Policy, regardless of the validity of Carter's claims.

121. Defendants combined and joined in a concerted effort to formulate a fraudulent and deceitful scheme as set out herein.

122. As set out herein, Defendants agreed and worked together to knowingly misrepresent information to Carter and others. Acts of coconspirators are

attributable to each other.   Defendants agreed and acted together to engage in unlawful conduct that injured Carter.

123.   At all times mentioned herein, Defendants intentionally, knowingly, and voluntarily participated in a common scheme ("common scheme") pursuant to an agreement whereby Defendants, acting in concert, furthered said agreement by Defendants' committing tortious acts, as set forth the Counts enumerated herein and incorporated by this reference. Defendants intentionally, knowingly, and voluntarily agreed to commit overt acts furtherance of the conspiracy.

## COUNT II – BREACH OF CONTRACT

### (Against Companion Life)

124.   Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

125.   The medical treatment Carter received is covered under the policy of insurance and claims made by the providers of Carter's treatment should have been paid.

126.   By denying coverage for Carter's loss, Companion Life breached the terms of the policy of insurance.

127.   As described herein, Companion Life breached the policy of insurance at issue by failing to pay benefits due under the policy.

128.   Companion Life did not mail or deliver to Carter within a reasonable time a copy of the policy or other required policy documents as mandated by Alabama Code § 27-14-19.  As a result of that failure, Plaintiff was prejudiced.  As such, Companion Life should be estopped from asserting any coverage exclusions.

129.   As a result of Companion Life' breach of contract, Carter suffered damages as enumerated herein and is entitled to any and all available compensatory and punitive damages.

## COUNT III – BAD FAITH

### (Against Companion Life)

130.   Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

131.   An insurance contract existed between Companion Life and Carter.

132.   Carter, both individually and through his providers, made claims covered under the policy and Companion Life was obligated to pay such claims.

133.   Companion Life intentionally refused to pay said claims.

134.   Companion Life had no reasonably legitimate or arguable reason to refuse to pay the claim at the time the claim was denied.

135.   Companion Life had actual knowledge that there was no reasonably legitimate, arguable or debatable reason, or it intentionally or recklessly failed to determine whether there was a legitimate or arguable reason to refuse to pay the claim.

136.   Companion Life broke the obligation of good faith and faith dealing by denying and failing to pay the claims made by Carter/Carter's medical providers under the applicable insurance policy.

137.   Companion Life did not mail or deliver to Carter within a reasonable time a copy of the policy or other required policy documents as mandated by Alabama Code § 27-14-19.  As a result of that failure, Plaintiff was prejudiced.  As such, Companion Life should be estopped from asserting any coverage exclusions.

138.   In addition to the contractual damages suffered by Carter, he also suffered emotional distress and economic loss.

139.   As a result of Companion Life's bad faith refusal to pay benefits, Carter is entitled to any and all available compensatory damages, punitive damages, penalties, fees, and other relief available.

## <u>COUNT IV – FRAUD / MISREPRESENTATION</u>
### (Against All Defendants)

140.   Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

141.   During a telephone call on March 4, 2016, Defendants, by and/or through an agent, falsely represented to Carter that the Policy covered "everything except pregnancy and rehab."

142.   Defendants, by and/or through an agent, failed to disclose to Carter a host of exceptions to coverage and the existence of exclusions for pre-existing conditions.

143.   Defendants, separately and severally, or by and/or through an agent, intended at the time of the sale of the Policy to Carter that no benefits would ever be paid under the Policy, regardless of the validity of Carter's claims.

144.   A host of exceptions to coverage, and the existence of exclusions for pre-existing conditions, were not articulated to Carter prior to, or during, the application process.

145.   Defendants misrepresented material facts as set forth above in the during the course of his coverage and during the course of claims related to the subject insurance.

146.   Defendants made several affirmative misrepresentations of fact to Carter, which Carter relied upon to his detriment and has been damaged as a result thereof.

147.   Defendants intended by their misrepresentations to deprive Carter of his rights and monies to which he should be entitled.

148.   In justifiable reliance on Defendants' misrepresentations and concealments of material fact as set forth above, Carter did purchase, maintain, and renew the subject insurance and suffered damages as a result thereof.

149.   As a result of Defendants' fraud, Carter suffered damages and is entitled to any and all available compensatory damages, punitive damages, and any forms of relief available.

## COUNT V – PROMISSORY FRAUD / FRAUD IN THE INDUCEMENT
### (Against All Defendants)

150.   Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

151.   Defendants intended by its misrepresentations to induce Carter to purchase, maintain, and/or renew the subject insurance, specifically, but not exclusively, by those misrepresentations as set out in Paragraphs 82-100 and those concealments as set out in Paragraphs 113-146 and otherwise enumerated herein.

152.   Defendants harbored a present intent upon selling the Policy and/or entering into its agreement with Carter not to perform its contractual obligations thereunder.

153.   At the time coverage issued to Carter, Defendants had an intent to deceive and not honor the obligations under the policy, or those obligations as stated by their agent.

154.   At the time coverage issued to Carter, these entities knew they were selling an inferior product of little to no value and were being unjustly enriched, and at the same time had an intent to deceive and not honor the obligations under the policy, or those obligations as stated by the agent.

155.   At the time coverage issued, Defendants knew and intended that no benefits would ever be paid to Carter under the Policy, regardless of the validity of his claim.

156.   Defendants suppressed and concealed the material fact that it would engage in sham benefit evaluations and investigations and reviews in order to concoct a basis to deny Carter benefits.

157.  In justifiable reliance on Defendants' misrepresentations and concealments of material fact as set forth above, Carter did purchase, maintain, and renew the subject insurance and suffered damages as a result thereof.

## COUNT VI - NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

158.   Carter adopts and incorporates by reference each preceding paragraph as if set forth fully at length herein.

159.   Defendants negligently misrepresented, concealed, and/or failed to fully disclose material facts as set forth above in the sale of the subject insurance to Carter, specifically, but not exclusively, those misrepresentations as set out in Paragraphs 82-100 and those concealments as set out in Paragraphs 113-146 and otherwise enumerated herein.

160. In   justifiable   reliance   on   Defendants'   misrepresentations, concealments, or failure to fully disclose material fact as set forth above, Carter purchased and maintained the subject insurance and suffered damages as a result thereof.

## COUNT VII – UNJUST ENRICHMENT
### (Against All Defendants)

161.   This Count is pleaded in the alternative to COUNT II and COUNT III or herein based on the existence of a contract.  Carter adopts and incorporates the allegations of the preceding paragraphs as if fully set out hereafter, excluding those

allegations pleaded under COUNT II and COUNT III or herein based on the existence of a contract.

162. Defendants, and/or by and through their agents, as delineated herein, made, issued, or caused to be made, or issued, written and/or oral statements misrepresenting or making misleading incomplete comparisons as to the terms, conditions or benefits contained in the MSGA/HII/Companion policy for the purpose of attempting to induce, intending to induce, and, in fact, inducing Carter to retain the insurance policy.

163. Defendants were unjustly enriched by the fees, premiums, and membership fees collected from Plaintiff Carter.

164. The Defendants' concealed relationship among one another and their agreeing to excessive economic arrangements, whereby MSGA's members pay more than the benefits received are worth, their participation in a marketing scheme, whereby Carter received none of the protections of an individual medical policy and none of the benefits of a group policy, their charging membership fees or dues for which Carter received no substantive benefits or services, and their engaging in other unfair and inequitable conduct against Carter, caused him to suffered damages as a reasonably foreseeable result, including increased premiums, impairment of credit, loss of the benefit of the bargain, loss of use of funds to pay medical expenses, debt

charges, and payments made for insurance under the guise of membership fees from which Carter received no substantive benefits.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff Jeremy Carter demands, on all counts enumerated herein and for all causes of action expressed herein:

I.      Compensatory and punitive damages against the Defendants in an amount to be determined by the trier-of-fact, including interest, costs, and attorney fees;

II.      Any such other, further and different relief as is available to Plaintiff.

Respectfully Submitted,

s/ Trey J. Malbrough
Trey J. Malbrough
Bar Number: ASB-2898-R46M
Attorney for Plaintiff Jeremy Carter
The Malbrough Firm LLC
Post Office Box 531383
Birmingham, Alabama 35253
T: (205) 701 - 0707
F: (205) 820 - 0123
E: trey@tmbfirm.com