FILED

2021 Mar-18  PM 03:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JEREMY CARTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-350-GMB |
| | ) | |
| COMPANION LIFE INSURANCE | ) | |
| COMPANY, *et. al*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeremy Carter filed his original complaint on March 5, 2018, asserting claims under the Racketeer-Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq.*, and state law. Doc. 1.  Since the original filing, Carter's complaint has undergone multiple revisions, but the basic allegations remain the same. *See* Docs. 43, 46, 51, 66, 72, 80, 92 & 143.  In generalized terms, Carter contends that the defendants defrauded him by selling "sham" health insurance under a group policy issued by Defendant Med-Sense Guarantee Association ("Med-Sense"), underwritten by Defendant Companion Life Insurance Company ("Companion Life"), administered by Defendant Allied National, Inc. ("Allied"), and marketed by Defendant Health Insurance Innovation, Inc. ("HII").

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge. Doc. 37.  Before the court is HII's Motion for

Summary Judgment. Doc. 146.  HII filed a brief and evidence in support of its motion. Doc. 147 & Doc. 146-1 to -11.  Within its brief, HII also moves to strike a portion of an errata sheet. Doc. 147 at 14–16.  Carter filed a brief (Doc. 161) and evidence (Doc. 161-1) in opposition to the motion and also filed a motion to strike (Doc. 160) one of HII's exhibits.  Carter opposes HII's argument to strike a portion of his errata sheet. Doc. 161 at 7–11.  HII filed an opposition to Carter's motion to strike (Doc. 168) and filed a reply brief (Doc. 167) in support of its motion for summary judgment.  Finally, Carter filed a reply in support of his motion to strike. Doc. 169.  Accordingly, the motion for summary judgment and motions to strike are fully briefed and ripe for decision.  For the following reasons, HII's motion to strike is due to be denied, Carter's motion to strike is due to be denied, and HII's motion for summary judgment is due to be granted.

## I.  MOTIONS TO STRIKE

Before the court are two motions to strike. The first is HII's motion to strike a portion of Carter's errata sheet. Doc. 147 at 14–16.  The second is Carter's motion to strike the declaration of Christine L. Gillis and various attached exhibits (Doc. 147-5), all of which HII submitted in support of summary judgment. Doc. 160.  The court first addresses the errata sheet and then Gillis' declaration and exhibits.

### A.    Carter's Errata Sheet

During Carter's deposition, counsel for HII asked Carter if he could have

accessed the insurance policy online. Doc. 147-1 at 160.  In response, Carter stated, "I could have, but chose not to. . . .  I was already explained everything it covered." Doc. 147-1 at 160.  In his errata sheet, Carter amends his answer to this question to reflect as follows: "I don't know if I could have; but I did not.  I was already explained everything it covered." Doc. 147-11 at 2.  Carter's stated reason for the change is that he "do[es] not know what was available online" at the time, and he points to two other portions of his deposition testimony where he stated as much. Doc. 147-11 at 2.  That testimony is as follows:

> Q:     All right.  And then [an email] says, All of your important insurance information is available for you to view, download and print at—and then it gives a web address of HIIQuoteCustomers.com. Did I read that correctly?
> A:     Yes, sir.
> Q:     Did you read that as well?
> A:     I did not.
> . . .
> Q:     Did you even know if a certificate of coverage was available for you to look at?
> A:     No, sir.
> Q:     Okay, do you know if any other information was available for you to observe on that website?
> A:     No, sir, I was just—said that I would be sent a receipt.

Doc. 147-1 at 92 & 252.

Federal Rule of Civil Procedure 30(e) allows a deponent 30 days from receipt of a deposition transcript to sign a statement listing any "changes in form or substance" and the reason for the changes. Fed. R. Civ. P. 30(e)(1).  While the plain language of Rule 30(e) allows for changes in the substance of deposition transcripts,

there is a split of authority as to whether substantive alterations are permissible.

Some federal courts have adopted a narrow interpretation of Rule 30(e) and thus permit only corrections of typographical or transcription errors, not material changes to deposition testimony. *See Hambleton Bros. Lumber Co. v. Balkin Enters.*, *Inc.*, 397 F.3d 1217, 1225–26 (9th Cir. 2005) ("hold[ing] that Rule 30(e) is to be used for corrective, and not contradictory changes"); *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000) (concluding "that a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not'"); *see also Burns v. Bd. of County Comm'rs of Jackson County*, 330 F.3d 1275, 1282 (10th Cir. 2003) ("[T]he Rule cannot be interpreted to allow one to alter what was said under oath.  If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses.").  Other courts, however, have adopted a broad reading of Rule 30(e) and have allowed deponents to make substantive changes. *See Podell v. Citicorp. Diners Club, Inc.,* 112 F.3d 98, 103 (2d Cir. 1997) (noting that the language of Rule 30(e) does not place limits on the types of changes that a deponent can make to deposition testimony); *Foutz v. Town of Vinton*, 211 F.R.D. 293, 295 (W.D. Va. 2002) (stating that Rule 30(e) should be interpreted "broadly as to allow proposed deposition changes to be admitted into evidence"); *DeLoach v. Philip Morris Cos., Inc.*, 206 F.R.D. 568, 573 (M.D. N.C.

2002) (rejecting defendants' reading of Rule 30(e), which would strike all but typographical errors, as too narrow); *Holland v. Cedar Creek Mining, Inc.*, 198 F.R.D. 651, 653 (S.D. W.Va. 2001) (noting that some authority questions the scope of allowable changes, but finding that the rule itself does not limit substantive changes); *Tingley Sys., Inc. v. CSC Consulting, Inc.*, 152 F. Supp. 2d 95, 120 (D. Mass. 2001) (stating that "the express language of Rule 30(e) allows a deponent to change the substance of his answers").  Courts within the Eleventh Circuit adopting a broader view of Rule 30(e) have correctly noted the narrow interpretation's inconsistency with the plain language of the rule. *See Unlimited Res. Inc. v. Deployed Res.*, LLC, 2010 WL 55613, at *3 (M.D. Fla. Jan. 5, 2010) (reviewing cases interpreting Rule 30(e) and concluding that the cases adopting a broad view of the Rule are more persuasive because the text of the rule explicitly mentions changes in substance and because there are safeguards to prevent abuse); *Cultivos Yadran S.A. v. Rodriguez*, 258 F.R.D. 530, 533 (S.D. Fla. 2009) (denying motion to strike substantive errata sheet changes because the majority view interpreting Rule 30(e) broadly "is in line with the plain language of Rule 30(e) which contemplates 'changes in form or substance'" and "furthers the purpose of the discovery process— to allow the parties to elicit the true facts of a case before trial").

The Eleventh Circuit has not explicitly decided this question.  HII contends the Eleventh Circuit has adopted the narrow interpretation of the rule and relies on

the Eleventh Circuit's decision in *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1281 (11th Cir. 2010), for the proposition that "[a] change in substance . . . is permissible only to correct an error in transcription, not to modify the deponent's testimony." Doc. 147 at 14.  But the issue before the Eleventh Circuit in *Norelus* was not the one presented here.  In *Norelus*, the Eleventh Circuit affirmed the district court's imposition of sanctions on the plaintiff's attorneys because they submitted a "novella-length errata sheet" that attempted "to alter their client's deposition testimony in 868 ways," which "rendered the eight days spent on [the plaintiff's] deposition a waste of time and money." *Norelus*, 628 F.3d at 1281–82.  The issue on appeal was not whether the changes were permissible, but whether the district court erred in sanctioning the attorneys.  *Norelus* therefore offers little guidance on the instant dispute.

This court is persuaded by the reasoning of the cases adopting a broad interpretation of Rule 30(e).  This interpretation is consistent with the plain language of the rule, which contemplates "changes in form or substance" accompanied by a signed statement reciting the reason for any changes.  Allowing substantive changes is in keeping with the truth-seeking purpose of the discovery process.  In contrast, the narrow view prohibits all substantive changes, including corrective changes. While the court agrees that a deposition should not be a take-home examination, the broad approach allows for legitimate corrective changes while implementing

6

adequate safeguards to prevent abuse.[1]  For these reasons, the court will allow the modifications to Carter's testimony memorialized in his errata sheet.

## B.    Gillis Declaration

Carter moves to strike the declaration of Christine L. Gillis and the evidence attached to her declaration. Doc. 160.  Carter argues that the declaration is not based on personal knowledge and is not admissible in its current form. Doc. 160 at 3–8. Both arguments fail.

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *Macuba v. DeBoer*, 193 F.3d 1316, 1322–23 (11th Cir. 1999) ("Affidavits must be based on personal knowledge and must set forth facts that would be admissible under the Federal Rules of Evidence.").  "An affidavit or declaration based on anything less than personal knowledge is insufficient." *Duke v. Nationstar Mortg., L.L.C.*, 893 F. Supp. 2d 1238, 1244 (N.D. Ala. 2012) (citing *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002)). "[T]he affidavit or declaration must state the basis for such personal knowledge." *Id*. (citing *Bruce*

---

[1] These safeguards include the fact that the original answer remains in the record and can be read to the jury at trial, the possibility of reopening the deposition, and the potential assessment against the deponent of the costs of any additional discovery necessitated by substantive changes. *See Reilly v. TXU Corp.*, 230 F.R.D. 486, 490 (N.D. Tex. 2005).

*Constr. Corp. v. United States*, 242 F.2d 873, 877 (5th Cir. 1957)).  "For a matter to be considered within a witness's personal knowledge, it must be 'derived from the exercise of his own senses, not from the reports of others—in other words, it must be founded on personal observation.'" *Riley v. Univ. of Ala. Health Servs. Found., P.C.*, 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014) (quoting *United States v. Evans*, 484 F.2d 1178, 1181 (2d Cir. 1973)).  "[P]ersonal knowledge can be based on a review of relevant business files and records." *Duke*, 893 F. Supp. 2d at 1244 (citations omitted).

Gillis' declaration meets all of the requirements of Rule 56(c)(4).  Her affidavit affirms her personal knowledge and explains the basis for that knowledge. Gillis states that she is HII's Director of Compliance Technology and Operations and is "knowledgeable about HII's business practices and operations pertinent to the allegations in the Complaint filed in this lawsuit." Doc. 147-5 at 2 & 3.  She properly authenticates each of the documents attached to her declaration as based on her review of HII's business records. Doc. 147-5 at 3; *see Ekokotu v. Fed. Exp. Corp.*, 408 F. App'x 331, 335 (11th Cir. 2011) ("[A] person who testifies concerning documents admitted pursuant to the business records exception to the hearsay rule need not have prepared the documents so long as other circumstantial evidence and testimony suggest their trustworthiness.") (citations omitted); *Branch Banking & Tr. Co. v. S & S Dev., Inc.*, 2014 WL 2215703, at *4 (M.D. Fla. May 28, 2014) ("Based

on Nunez's representation that he is an employee of BB&T and that his affidavit is based on personal knowledge and a review of certain BB&T business records, the Court may rely on his affidavit."); *Duke*, 893 F. Supp. 2d at 1244 (accepting affidavit stating that an employee "reviewed Nationstar's records and that he has knowledge of the facts set forth in the declaration").  Additionally, the court agrees with HII that Gillis' declaration could be reduced to admissible form even if it is not admissible at present.  For these reasons, the motion to strike is due to be denied.

## II.  MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The purpose of summary judgement is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted).  The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one

inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## B.   Statement of Relevant Facts[2]

HII is a developer, distributor, and virtual administrator of cloud-based individual and family insurance plans and supplemental products. Doc. 147-5 at 2. HII makes insurance documents, such as insurance policies, applications, and insurance cards, available to insureds through an online portal. Doc. 147-5 at 3.  HII provides insureds with a login and password for accounts by email after their applications have been approved. Doc. 147-5 at 3.

### 1.   Carter's Application and Receipt of the Policy

On March 4, 2016, Carter searched for "Blue Cross Blue Shield cheap insurance" on Google, clicked on one result that was "on the cheaper end," and called the toll-free number. Doc. 147-1 at 30–31, 35 & 37.  A man[3] answered his

---

[2] Plaintiff's brief does not contain a stand-alone section setting forth the relevant facts.
[3] Although the man identified himself and the company he worked for, Carter could not recall the name or the employer. Doc. 147-1 at 41 & 45.

call and they began to talk about health insurance. Doc. 147-1 at 41–42 & 47.  The agent reviewed the policy with Carter, asked him some questions, filled out an application for Carter based on his answers, and signed the application with Carter's permission. Doc. 147-1 at 58 & 111–22.  The agent explained that Carter "could go to a doctor if I need to . . . . He explained if I went in the hospital it was a pretty big deductible, but . . . I did have insurance for a hospital." Doc. 147-1 at 43.  Carter remembers the person telling him that "it covers everything but rehab and pregnancy." Doc. 147-1 at 42, 47 & 62–63.  Carter further testified that he "remember[ed] there being an exclusion if I had a pre-existing condition" and "he named off some things that I don't really remember all of which" would qualify as a pre-existing condition. Doc. 147-1 at 46–47.  In fact, Carter stated that the agent "asked [him] do you have any pre-existing conditions and named off a few things, and [Carter] stopped him and [Carter] said no" that he did not "have heart disease, kidney failure, nothing like that." Doc. 147-1 at 103; *see also* Doc. 147-1 at 118–19.

The agent explained to Carter that he would receive an email for confirmation of payment. Doc. 147-1 at 50.  He also told Carter that he would be mailed his cards and policy and that he "could also look it up online." Doc. 147-1 at 51.  Carter received two insurance cards and a welcome letter in the mail, but he did not receive a copy of the policy by mail. Doc. 147-1 at 51 & 96.  Carter was not worried that he had not received a copy of the policy because the agent "told [him] exactly what was

covered," and Carter is "not the type of person that is going to dig in further" because he "hates paperwork" and "hate[s] reading." Doc. 147-1 at 53.

Carter did, however, receive an email on the same day as his conversation with the agent that gave him the ability to log on to the HII online portal. Doc. 147-1 at 55, 91 & 276.   The portal gave Carter "access to review all of his policy documents, the details of his insurance premium, the plan information, the applicant information et cetera." Doc. 161-2 at 60.  The email contained his login information, including his member identification, login identification, and password. Doc. 147-4 at 2.  Above his login information, the email contained a section titled "View and Download Your Benefits." Doc. 147-4 at 2.  The heading of this section read: "All of your important insurance information is available for you to view, download and print at HIIQuiteCustomers.com." Doc. 147-4 at 2.  The email also explained HII's 10-day free-look policy.  Specifically, it stated that "[i]f you are not satisfied for any reason and no claims have been [filed], you may cancel your plan within 10 calendar days of your effective date to receive a full refund." Doc. 147-4 at 2.

After he logged into the portal, Carter testified that he "looked and s[aw] it said welcome, it looked legit.  [He saw] where [his] money had come out and that was [his] reference for a receipt, so [he] was good with that." Doc. 147-1 at 56.  He did not look at anything else in the portal and he does not remember what was available. Doc. 147-1 at 56–57.  It is undisputed that Carter never accessed or read

the policy and does not know what the policy language covers. Doc. 147-1 at 72–73.

### 2.     *Relevant Portions of the Policy*

The policy Carter purchased contains a section titled "EXCLUSIONS." Doc. 147-2 at 15. The section begins by stating that "[c]harges for the following treatments and/or services and/or supplies and/or conditions are excluded from coverage." Doc. 147-2 at 15. Sixty numbered paragraphs follow this heading. Doc. 147-2 at 15–17. The first numbered paragraph states:

> 1.     Pre-existing Conditions—Charges resulting directly or indirectly from a condition for which a Covered Person received medical treatment, diagnosis, care or advice within the sixty-month period immediately preceding such person's effective date are excluded for the first 12 months of coverage hereunder. . . .

Doc. 147-2 at 15 & 29. Pre-existing conditions include "conditions that produced any symptoms which would have caused a reasonable person to seek diagnosis, care or treatment within the sixty-month period immediately prior to the coverage effective date." Doc. 147-2 at 29. Additional relevant exclusions include the following:

> 6.     Substance Abuse.
> . . .
> 57.     Kidney or end stage renal disease.
> 58.     Joint replacement or other treatment of joints, spine, bones or connective tissue including tendons, ligaments and cartilage, unless related to a covered injury.

Doc. 147-2 at 15, 17, 29 & 30.

### 3.     *Carter's Relevant Medical Expenses*[4]

On April 29, 2016, Carter visited It's About Time Urgent Care in Helena, Alabama, for back pain. Doc. 148-1 at 2–6.  According to his medical records, Carter reported that his pain was not the result of a new injury, but that he was having a "flare of back pain that is a chronic injury from several previous accidents when he was younger." Doc. 148-1 at 2 & 4.  Carter also reported that he had been taking suboxone[5] for more than a year and a half for his back pain and for addiction to pain medications, but that he had weaned himself off suboxone in the last few weeks. Doc. 148-1 at 2 & 4.  The medical records indicate a diagnosis of "bipolar disorder (status Active)" and "other psychoactive substance abuse, uncomplicated (status active), pain medications." Doc. 148-1 at 2.  Carter received an injection of Ketorolac (Toradol) and a prescription for naproxen, and he was instructed to follow up with his primary care physician in two weeks. Doc. 148-1 at 3 & 4.

Companion rejected the claims associated with this visit. Doc. 148-2 at 3.  The explanation of benefits form associated with the visit identified the reason for the rejection: "[e]xpenses caused by, incurred for, or resulting from joint replacement or

---

[4] There are other medical visits in the record that were denied by Companion. *See, e.g.*, Doc. 148-2 at 2 & 4.  HII highlights only the two medical visits addressed in this section in its statement of facts and Carter does not point to any other visits as a basis for his claim.

[5] Suboxone "is a prescription medicine used to treat adults who are addicted to (dependent on) opioid drugs (either prescription or illegal) as part of a complete treatment program that also includes counseling and behavioral therapy." Suboxone Indications, https://www.suboxone.com/ (last visited March 15, 2021).

other treatment of joints, spine, bones, or connective tissues, including tendons, ligaments and cartilage, unless due to Bodily Injury incurred while a Member under the Certificate or Summary Plan Description, are not covered." Doc. 148-2 at 3.

On July 25, 2016, Carter was admitted to Shelby Baptist Medical Center for acute renal failure from dehydration. Doc. 148-1 at 10–11 & 13.  The clinical impressions upon his admission note opiate withdrawal, nausea, vomiting and diarrhea, and acute renal insufficiency. Doc. 148-1 at 8.  According to the medical records, Carter reported that he has been taking "Norco" every day for six months because of pain. Doc. 148-1 at 10.  He reported daily use of opiates and Xanax, and admitted to using heroin. Doc. 148-1 at 12.  The notes reflect that Carter "admitted to needing substance abuse treatment information" and that he planned "to start outpatient treatment" upon discharge. Doc. 148-1 at 11.

Companion rejected the vast majority of the claims associated with this hospital admission. Doc. 148-2 at 5–8.  The reason stated for the rejections was that "[e]xpenses caused by, incurred for, or resulting from kidney or end stage renal disease are not eligible under the terms of the Certificate or Summary Plan Description."[6] Doc. 148-2 at 5, 7 & 8.  Companion did, however, cover a radiologic examination based on Carter's elevated white blood cell count and credited the

---

[6] The explanation also states that the "grounds for denial may not be exhaustive.  The plan reserves the right to state other grounds/defenses at a later date." Doc. 148-2 at 5, 7 & 8.

charge toward Carter's deductible. Doc. 142-8 at 6.

## C.    Discussion

The second amended complaint asserts the following claims against HII: (1) civil conspiracy; (2) fraud/misrepresentation; (3) promissory fraud/fraud in the inducement; (4) negligent misrepresentation; and (5) unjust enrichment. Doc. 143 at 35–37 & 40–45.   HII contends that Carter abandoned his claims for conspiracy, promissory fraud, and unjust enrichment because he failed to respond to the arguments HII presented in support of summary judgment. Doc. 167 at 12.   The court agrees.

It is the responsibility of the party opposing summary judgment to formulate arguments in support of its position.  "In opposing a motion for summary judgment, a party may not rely on [its] pleadings to avoid judgment against [it].  There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Edmondson v. Bd. of Trs. of Univ. of Ala.*, 258 F. App'x 250, 253 (11th Cir. 2007); *see also Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (affirming the district court's grant of summary judgment where the plaintiff failed to respond to or otherwise address a claim); *Clark v. City of Atlanta*, 544 F. App'x 848, 855 (11th Cir. 2013) (same);

*Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party."). Accordingly, Carter's failure to respond to HII's arguments regarding his claims for conspiracy, promissory fraud, and unjust enrichment is an abandonment of those claims. HII's motion for summary judgment as to those claims is due to be granted.

Because some claims have been abandoned, the only causes of action under consideration are fraudulent misrepresentation and negligent misrepresentation. These claims are closely related and require similar proof. To recover on a claim for fraudulent misrepresentation, Carter must establish four elements: "(1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result." *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455, 463 (Ala. 2000) (citing Ala. Code § 6-5-101). Similarly, a claim for negligent misrepresentation requires proof of "(1) a misrepresentation of material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) which was reasonably relied on by the plaintiff under the circumstances, and (4) which caused damage as a proximate consequence." *Bryant Bank v. Talmage, Kirkland & Co, Inc.*, 155 So. 3d 231, 238 (Ala. 2004) (citations omitted). Both claims fail for two separate, independent reasons. First, Carter has not proven a

misrepresentation.  Second, even if he had proven a misrepresentation, Carter has not established reasonable reliance.

### 1.    *Misrepresentation*

Carter alleges that HII misrepresented the coverage of the policy. Specifically, he claims in his amended complaint that the insurance agent told him that the policy covered "everything except pregnancy and rehab." Doc. 143 at 30 (internal quotation marks omitted).  He also contends that HII and the other defendants "failed to disclose to Carter a host of exceptions to coverage and the existence of exclusions of pre-existing conditions." Doc. 143 at 40.  The problem for Carter, however, is that the record evidence does not substantiate these allegations.

Carter testified in deposition that the agent told him about other exclusions, including those for pre-existing conditions, heart disease, and kidney failure. Doc. 147-1 at 46–47, 103 & 118–19.  Indeed, Carter even admitted that he interrupted the agent while listing the exclusions by stating that he did not have any of them, "that [his] immune system was really well and [he] hadn't had any kind of disease." Doc. 147-1 at 118–19.  This testimony directly contradicts the allegations of the complaint and extinguishes any claim based on the alleged misrepresentation of the policy exclusions. *See, e.g.*, *Hembree ex rel. Hembree v. Provident Life & Acc. Ins. Co.*, 127 F. Supp. 2d 1265, 1271 (N.D. Ga. 2000) (finding plaintiff legally competent

where her deposition testimony contradicted the complaint's allegations of mental incompetence). For this reason, summary judgment is due to be granted in favor of HII on both misrepresentation claims.

### 2.    *Reasonable Reliance*

Even if Carter could somehow establish a material misrepresentation, his claims would fail because he cannot show that he reasonably relied on that misrepresentation. Under Alabama law, a plaintiff cannot reasonably rely on oral representations when he has executed a written contract that contradicts those representations. *Tyler v. Equitable Life Assurance Soc'y of the U.S.*, 512 So. 2d 55, 57 (Ala. 1987). In cases where an insured brings fraud claims based on oral representations made by an employee of the insurer contradicting the language of the policy, the Alabama Supreme Court frames the "relevant inquiry [as] . . . whether it was reasonable for the insured to rely on an insurance agent's representations about an insurance policy when those representations are contradicted by language in the policy itself." *Maloof v. John Hancock Life Ins. Co*., 60 So. 3d 263, 271 (Ala. 2011) (alteration added). In this context, the Alabama Supreme Court "has repeatedly stated that it is not" reasonable as a matter of law to rely on oral representations. *Id*.

Carter contends that HII misrepresented the exclusions in the policy by claiming that it covered everything but pregnancy and rehab, and thereby suppressed the fact that there were other exclusions. The language of the policy, which sets out

more than 60 exclusions, flatly contradicts this alleged statement.  For this reason, Carter could not have reasonably relied on the alleged oral misrepresentations.

Carter nevertheless argues that he "never possessed any documents that conflicted with the representations of HII's agent." Doc. 161 at 14.  The undisputed evidence belies this claim.  Carter received an email from HII with his login information for the HII online portal. Doc. 147-1 at 55, 91 & 276.  The portal gave Carter "access to review all of his policy documents, the details of his insurance premium, the plan information, the applicant information et cetera." Doc. 161-2 at 60.  Additionally, the email informed Carter that "[a]ll of your important insurance information is available for you to view, download and print" on HII's website. Doc. 147-4 at 2.  Carter admits that he accessed the online portal to confirm his payment, and the business records confirm his testimony. Doc. 147-1 at 56; *see also* Doc. 147-5 at 3–4.  This evidence thus establishes that the policy was available to Carter even if he chose not to read it.

Carter's arguments to the contrary are unpersuasive.  Carter's claims that he did not know what was available online and that he did not read the policy online because he had been promised a hard copy of the policy by mail (Doc. 161 at 10–11) do not undermine the undisputed fact that Carter had access to the policy. Additionally, Carter's contention that HII did not prove that he could access the policy through his phone and that he did not consent to receive the policy documents

21

electronically are inapposite. Doc. 161 at 14.  Carter has not offered any authority, and the court has not found any, that would require HII to make either showing in the context of a fraudulent or negligent misrepresentation claim.  Finally, Carter's argument that he was "damaged before he received the email" (Doc. 161 at 11–13) ignores the ten-day "free look" period allowing Carter to cure any potential harm by cancelling his policy for any reason within ten days of purchase and before submitting a claim. Doc. 147-4 at 2.

For these reasons, Carter cannot establish that he reasonably relied on the alleged misrepresentations of the agent.  Summary judgment is due to be granted in favor of HII for this additional reason.

### III.  CONCLUSION

For these reasons, it is ORDERED that:

1.     HII's Motion for Summary Judgment (Doc. 146) is GRANTED;

2.     HII's motion to strike the change to Carter's errata sheet (Doc. 147) is DENIED; and

3.     Carter's Motion to Strike (Doc. 168) is DENIED.

An order dismissing Carter's claims against HII will be entered separately.

DONE and ORDERED on March 18, 2021.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

22